UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | BKY 18-43863-KHS |
| Michael John Riehm, | Chapter 7 |
| Debtor. | |

| | |
|---|---|
| Daniel N. Kerkinni, | |
| Plaintiff, | |
| | ADV 19-04057 |
| v. | |
| Michael John Riehm, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

At Minneapolis, Minnesota, March 5, 2020.

This adversary proceeding came on for trial on September 30, 2019, to determine the dischargeability of a debt arising out of a stabbing at a New Year's Eve party in 2014.

Lee Orwig and Ruth Honkanen appeared on behalf of Plaintiff Daniel N. Kerkinni. Defendant Michael John Riehm appeared pro se. On October 1, 2019, the Court ordered supplemental post-trial briefing.[1] Responses were filed, and the matter was submitted for decision on December 30, 2019.

For the reasons stated below, the Court finds in favor of Plaintiff; the debt is nondischargeable because Defendant caused a willful and malicious injury without just cause or excuse within the meaning of 11 U.S.C. § 523(a)(6).

---

[1] Dkts. 38, 45.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 03/05/2020
Lori Vosejpka, Clerk, by LH

This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) & 1334, Federal Rule of Bankruptcy Procedure 7001, and Local Rule 1071–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). Venue in this Court is proper under 28 U.S.C. §§ 1408 & 1409. Both Plaintiff and Defendant are residents of the State of Minnesota.

Defendant filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code on December 13, 2018. On Schedule E/F, Defendant listed Plaintiff as a nonpriority unsecured judgment creditor with a claim for $205,914.94.[2] Plaintiff timely filed this adversary proceeding on March 4, 2019. Defendant received a discharge on July 2, 2019, and the main case was closed on July 17, 2019.[3]

## WITNESSES

The following witnesses provided testimony in person at trial or by deposition:

- Jason Aguirre – Officer Aguirre is a police officer with the City of Minneapolis.

- Michael Tomczyk – At the time of the incident, Mr. Tomczyk ("Tomczyk") worked as the general manager at the Living Room.

- Michael John Riehm – Mr. Riehm is the Defendant and the debtor in the Chapter 7 bankruptcy case.

- Heather Riehm – Ms. Riehm ("Heather") is Defendant's spouse (collectively with Defendant, the "Riehms").

- Daniel N. Kerkinni – Mr. Kerkinni is the Plaintiff.

- McKenzee Sudduth – At the time of the incident, Ms. Sudduth ("Sudduth") worked as a supervisor at the Living Room.

---

[2] Case No. 18-43863, Dkt. 1, at 24.
[3] Case No. 18-43863, Dkt. 17.

- Sarah Bolon – At the time of the incident, Ms. Bolon ("Bolon") worked as a cocktail server at the Living Room.

- Sitania Syrovatka – Ms. Syrovatka ("Syrovatka"), then Plaintiff's girlfriend and now wife, attended the New Year's Eve party at the Living Room with Plaintiff and other friends.

- Steven Davis – Mr. Davis ("Davis") was the Riehms' server at Manny's Steakhouse, where they had dinner before attending the party.

- Robert Smith – Mr. Smith ("Smith") was the head of the security company on duty at the Living Room.

## FACTS

In the early hours of January 1, 2014, Plaintiff, Defendant, and Defendant's wife, Heather, were involved in several altercations at a New Year's Eve party at the Living Room bar in Minneapolis, Minnesota. During the last confrontation, Defendant stabbed Plaintiff. Plaintiff suffered serious injuries resulting in several hospitalizations and surgeries. While Defendant admits he stabbed Plaintiff, he argues that it was done in self-defense and in defense of Heather. Given the amount of alcohol admittedly consumed by the parties and several of the witnesses, the lapse in memories due to the passage of time, and limited evidence from disinterested witnesses, the Court has pieced together the following facts:

Defendant, then a licensed attorney, worked until 10:00 P.M. on December 31, 2013.[4] The Riehms then went to Manny's Steakhouse, located adjacent to the Living Room bar in the W Hotel, and were at dinner from approximately 10:30 P.M. until 12:15 A.M., January 1, 2014.[5] While at dinner, the Riehms bought a round of double scotches for themselves and a nearby

---

[4] Trial Tr., Dkt. 44, at 91:12–25, 140:9–17, Sept. 30, 2019.
[5] Trial Stipulations, Dkt. 34, at 4.

table.[6]  Heather also consumed a glass of champagne and a glass of wine at dinner.[7]  Heather

was intoxicated that night and she believed it affected her memory.[8]  Defendant consumed a

glass of champagne and a double scotch at dinner.[9]  He denied being intoxicated.[10]

After leaving dinner, the Riehms went to a New Year's Eve party at the Living Room

bar, entering through an adjacent door from Manny's.[11]  Plaintiff and Syrovatka were already at

the party, having arrived shortly before midnight.[12]  The bar was very crowded and after waiting

for some time, Defendant left Heather to try and get drinks at a different area of the bar.[13]  Not

long after, Heather and Syrovatka began a conversation.[14]  Plaintiff and Defendant were not

present when the conversation started.[15]  Plaintiff joined the conversation, which devolved into

an argument, and Plaintiff punched Heather in the face.[16]  After witnessing Plaintiff punch

Heather, Defendant ran up from near the coat check area and started yelling.[17]  Plaintiff and

Defendant then engaged in a short pushing and shoving match, which was broken up by

security.[18]  One of the security guards asked Plaintiff and his group of friends to leave since the

night was ending.[19]

---

[6] Trial Tr. 141:25–142:17; Davis Dep., Ex. AC, at 18:22–25, Sept. 17, 2015.
[7] Trial Tr. 141:25–142:17; H. Riehm Dep, Ex. AB, at 24:8–25:3, Aug. 27, 2015.
[8] Trial Tr. 165:15–17, 171:9–11; *see* Ex. AB, at 30:11–25.
[9] Riehm Dep., Ex. 30, at 16:1–19, Aug. 27, 2015.
[10] Ex. 30, at 6:4–14.
[11] Dkt. 34, at 4. *See generally* Floorplan, Ex. D.
[12] Dkt. 34, at 4; Syrovatka Dep, Ex. AD, at 20:17–19, Oct. 22, 2015.
[13] Trial Tr. 144:6–145:6, 167:21–25; Ex. 30, at 22:17–24, 25:7–24.
[14] Dkt. 34, at 4.
[15] Dkt. 34, at 4.
[16] Trial Tr. 93:13–94:1, 158:8–20, 183:9–25; *see* Dkt. 34, at 4; Police Report, Ex. 42, at 24; Bolon Dep., Ex. C, at 61:3–64:12, Sept. 17, 2015.
[17] Trial Tr. 93:22–94:1; Ex. 30, at 25:7–24, 66:3–14, 69:25–70:3.
[18] Dkt. 34, at 4; Smith Dep., Ex. AE, at 41:16–21, 43:13–22, Sept. 18, 2015.
[19] Dkt. 34, at 4; Ex. AE., at 41:16–21, 43:13–22, 47:17–48:2.

4

Tomczyk witnessed Heather holding her face, and took the Riehms to the restroom area.[20]  Tomczyk sat with Defendant for ten minutes in the restroom hallway.[21]  At the time, Defendant appeared to be calm, collected, sober, and not a threat.[22]

Sudduth, a supervisor on duty, testified that at some point during the night she saw Plaintiff pick Heather up by the throat, hold her against an iron gate for several seconds, choke her, slam her to the ground, and stand over her with his hands on her throat until he was pulled off by security.[23]  It is unclear from the record when this occurred, but the music was on and the lights were off.[24]

The shoving altercation ended at approximately the same time as last call.[25]  Last call took place at 1:35 A.M., with bar close five minutes later at 1:40 A.M.[26]  At bar close, the Living Room turned on the lights, shut off the music, and stopped serving alcohol.[27]

Tomczyk left Defendant before Heather came out of the restroom because a large fight had broken out in the arcade, which is a long hallway located outside of the Living Room, between the W Hotel's front entrance and lobby.[28]  The entire security team responded to the arcade fight.[29]  At this time, Plaintiff encountered a friend in the arcade, who invited Plaintiff up to a hotel room to avoid the fight.[30]  Realizing that another friend was not with them, Plaintiff left the arcade to re-enter the Living Room and find her.[31]

---

[20] Dkt. 34, at 4; Tomczyk Dep, Ex. B at 78:4–79:1, 84:3–13, Sept. 17, 2015.
[21] Dkt. 34, at 4–5; Ex. 30, at 83:19–21; Ex. B, at 96:13–22.
[22] Ex. B, at 89:5–8, 90:13–17.
[23] Trial Tr. 246:7–247:9, 251:15–18.
[24] Trial Tr. 251:21–252:10; Sudduth Dep., Ex. A, at 27:23–28:1, Oct. 22, 2015.
[25] Smith testified that the shoving altercation took place when the lights were turned on and patrons were moving toward the front entrance. Ex. AE, at 46:1–12. Tomczyk testified that the altercation occurred when the lights were down, but no more than a couple minutes before last call. Ex. B, at 77:13–25. Tomczyk further testified that it was bar close by the time he escorted the Riehms to the restrooms. Ex. B, at 84:14–22.
[26] Ex. B, at 33:9–24. The Living Room indicates last call by turning the interior lights red. Ex. B, at 33:16–24.
[27] Ex. B, at 33:9–24.
[28] Trial Tr. 52:14–53:6; Ex. B, at 89:5–9, 99:12–16. *See generally* Ex. D.
[29] Ex. AE, at 50:2–17, 51:4–22.
[30] Trial Tr. 187:2–25, 187:3–16, 188:1–18.
[31] Trial Tr. 189:14–24.

Meanwhile, Heather had left the restroom and the Riehms began to leave the restroom hallway.[32]  They stopped near the end of the restroom hallway and stood next to a server well adjacent to the end of the bar closest to the front entrance for approximately five minutes.[33] Bolon was also standing there.  According to Bolon, Heather was holding her face and the Riehms were visibly upset.[34]  Few, if any, people remained in the area besides Bolon and the Riehms.[35]  Security had already started moving patrons toward the front entrance, and the lights at the Living Room were on and the music was off.[36]  Bolon saw Defendant pick up a steak knife from the server well and put it up his coat sleeve.[37]  Defendant admits he grabbed the knife.[38]  At the time he picked up the knife, Defendant did not know where Plaintiff was located.[39]  Bolon told Defendant at least twice to return the knife.[40]  Bolon heard Defendant repeating something to the effect of "Nobody treats my wife like that" or "Nobody talks to my wife like that."[41]  Defendant left the area with the knife and Bolon screamed something to the effect of "He's got a knife."[42]

At this time, Plaintiff had re-entered the Living Room in search of his friend.[43]

Bolon saw Defendant leave the server well with the knife, walk briskly toward Plaintiff, stab him, and throw down the knife.[44]  No more than a few minutes elapsed between the time Defendant picked up the knife and the time he stabbed Plaintiff.[45]  This was during the arcade

---

[32] Trial Tr. 98:3–15, 155:15–156:11.
[33] Dkt. 34, at 5; Trial Tr. 99:6–23; Ex. 30, at 47:16–19.; Ex. C, at 71:9–12, 82:16–20; Ex. AB, at 52:25–53:6. *See generally* Ex. D.
[34] Dkt. 34, at 5; Ex. C, at 71:13–19, 76:14–21, 85:10–13.
[35] Ex. C, at 68:17–70:20.
[36] Ex. C, at 69:1–25, 71:4–5.
[37] Ex. C, at 73:3–11, 75:3–24, 77:15–18.
[38] Trial Tr. 101:6–14, 102:16–21, 103:18–23, 105:4–6.
[39] Trial Tr. 103:6–17.
[40] Ex. C, at 76:1–10, 78:7–79:9.
[41] Ex. C, at 72:19–23, 78:17–24.
[42] Trial Tr. 254:4–15, 255:15–25; Ex. C, at 79:25–80:7, 80:22–81:11, 82:13–15, 87:16–88:4.
[43] Trial Tr. 189:14–24.
[44] Ex. C, at 79:25–80:7, 80:22–81:11, 82:13–15.
[45] Ex. 30, at 49:7–13; Ex. C, at 107:20–108:6.

fight, at approximately 2:00 A.M.[46]  The stabbing incident was reported to the police at 2:05

A.M.[47]

Emergency medical serveries were provided until an ambulance arrived to transport

Plaintiff to Hennepin County Medical Center.[48]  Plaintiff was admitted to Hennepin County

Medical Center at 2:26 A.M, where he was diagnosed and treated for a collapsed lung.[49]

Plaintiff was hospitalized until January 5, 2014.[50]  On January 12, 2014, Plaintiff was readmitted

for complications stemming from an infection.  Plaintiff had additional surgery on January 21,

2014.

Defendant was charged with one count of assault in the first degree in Hennepin County

District Court.[51]  Before the jury trial, Defendant and the State of Minnesota agreed to submit the

matter to Judge Tamara Garcia upon stipulated evidence.[52]  On April 30, 2015, Judge Garcia

found Defendant guilty of assault in the first degree.[53]  Judge Garcia made no finding regarding

self-defense.[54]  Defendant was sentenced to one year in the workhouse and ordered to pay

restitution to Plaintiff in the amount of $43,503.78, later reduced to $43,026.98.[55]

In June 2014, Plaintiff filed a civil action for intentional battery against Defendant in

Hennepin County District Court.[56]  Judge Bridget Sullivan found as a matter of law that

Defendant committed an intentional battery.[57]  The only issues sent to the jury were the amount

---

[46] Trial Tr. 52:14–17, 53:1–6, 255:15–22; *see* Ex. 42 at 1; Ex. C, at 77:15–18; Ex. AE, at 49:24–50:17, 64:3–5.
[47] Ex. 42, at 1.
[48] Trial Tr. 21:1–5; Ex. 42, at 1.
[49] Hennepin County Medical Center Medical Records, Ex. S.
[50] Ex. S.
[51] *State of Minnesota v. Riehm*, Court File No. 27-CR-14-870.
[52] Findings of Fact, Conclusions of Law & Order Finding Defendant Guilty of Assault in the First Degree, Ex. 10, Apr. 30, 2015.
[53] Ex. 10.
[54] Ex. 10.
[55] Amended Restitution Findings & Order, Ex. 11, Sept. 19, 2016.
[56] *Kerkinni v. Riehm*, Court File No. 27-CV-14-8647.
[57] Order for Judgment, Ex. 4, Apr. 20, 2016.

of damages and Defendant's claim of self-defense or defense of others.[58]  The jury returned its

verdict on March 31, 2016.  The jury found that Defendant did not reasonably believe that the

use of force involving the risk of serious injury or death was necessary to protect himself or

Heather.[59]  The jury awarded Plaintiff $180,914.94 in compensatory damages.[60]  The jury also

found that Defendant acted with deliberate disregard for Plaintiff's rights and awarded $25,000

in punitive damages.[61]  After deducting for collateral sources, and adding for costs and

disbursements, judgment was entered against Defendant for $157,117.70.[62]

Plaintiff timely filed his Complaint in this Adversary Proceeding on March 4, 2019.

Defendant filed his Answer on April 2, 2019.[63]  On May 30, 2019, Plaintiff moved for summary

judgment, relying on the doctrine of collateral estoppel.[64]  Defendant filed a response in

opposition on August 15, 2019.[65]  On August 29, 2019, the Court held a hearing and denied

Plaintiff's motion.

At trial, Defendant moved for a directed verdict at the close of Plaintiff's case-in-chief.

The Court denied Defendant's motion.

## DISCUSSION

The issue in this case is whether Plaintiff's civil judgment is nondischargeable under 11

U.S.C. § 523(a)(6), as resulting from a willful and malicious injury caused by Defendant without

just cause or excuse.

---

[58] *See generally* Ex. 4.
[59] Ex. 4, at 3–5.
[60] Ex. 4, at 3–4.
[61] Ex. 4, at 5.
[62] Notice of Entry of Amended Judgment, Ex. 44, Dec. 29, 2016.
[63] Dkt. 6.
[64] Dkt. 9.
[65] Dkt. 22.

As a preliminary matter, Plaintiff's posttrial brief discussed at length the events that occurred after the stabbing, including: Defendant's failure to report any of Plaintiff's alleged attacks on Heather to the police, Defendant telling the police that he did not have a knife when questioned, and Heather's return to the W Hotel approximately an hour after the incident and her subsequent arrest for obstruction of legal process after attempting to grab the knife from a police officer.  While these facts may support Plaintiff's position, they are largely irrelevant, as Defendant's actions just before and at the time of the stabbing are what matter in determining willfulness and malice.[66]  Defendant's brief argues that he stabbed Plaintiff in self-defense, negating the element of malice.

## A.    Burden of Proof and Section 523(a)(6)

A principal purpose of the Bankruptcy Code is to give a fresh start to the honest but unfortunate debtor, in part through a discharge of prepetition debt.[67]  Section 523(a)(6) provides an exception from discharge for a debt resulting from a willful and malicious injury caused by the debtor.[68]  A party attempting to invoke this exception must demonstrate by a preponderance of the evidence the two distinct elements of willfulness and malice.[69]  Debts arising from injuries inflicted negligently or recklessly do not fall within the scope of Section 523(a)(6).[70]

The element of willfulness is subjective and requires a deliberate or intentional *injury*, as opposed to a deliberate or intentional *act* that leads to an injury.[71]  To prove willfulness, a party

---

[66] *See, e.g.*, *Estate of Sustache v. Mathews* (*In re Mathews*), 433 B.R. 732, 736 (E.D. Wis. 2010) ("[T]he reasonableness determination must be made at the time of the Debtor's act, i.e., the punch, not earlier in the evening.").

[67] *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)); *see Snyder v. Zaligson* (*In re Zaligson*), 591 B.R. 724, 736 (Bankr. D. Minn. 2018).

[68] 11 U.S.C. § 523(a)(6).

[69] *Id.*; *see Dering Pierson Grp., LLC v. Kantos* (*In re Kantos*), 579 B.R. 846, 851 (B.A.P. 8th Cir. 2018).

[70] *Hearing Assocs., Inc. v. Gervais* (*In re Gervais*), 579 B.R. 516, 523 (D. Minn. 2016) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998)).

[71] *Id.* (emphasis added).

must show that the debtor intended to bring about the injury or was substantially certain that his

conduct would result in the injury that occurred.[72]

    The element of malice requires proof of conduct targeted at the creditor, at least in the

sense that the conduct is certain or almost certain to cause harm.[73]  To prove malice, a party must

show a level of "culpability which goes beyond recklessness."[74]  Intent to cause harm is difficult

to establish, but "the likelihood of harm in an objective sense may be considered in evaluating

intent."[75]  Circumstantial evidence of the debtor's state of mind can also be used in evaluating

malice.[76]  Relevant to this adversary proceeding, a finding of malice requires a lack of just cause

or excuse for the debtor's conduct.[77]

## B.    Collateral Estoppel

    Plaintiff argues that the criminal conviction of assault in the first degree, civil judgment

for intentional battery, and the findings in both cases collaterally estop Defendant from

relitigating whether he caused a willful and malicious injury within the meaning of Section

523(a)(6).[78]  A plaintiff relying on collateral estoppel "must identify specific findings in the

---

[72] *Id.*  The category of injury that the Supreme Court envisioned when it addressed the term "willful" was that of an intentional tort, as opposed to negligent or reckless torts.  *Geiger*, 523 U.S. at 62; *see In re Kantos*, 579 B.R. at 851 (holding that the willful element is satisfied if the injury results from an intentional tort).

[73] *In re Kantos*, 579 B.R. at 851.

[74] *Johnson v. Miera* (*In re Miera*), 926 F.2d 741, 744 (8th Cir. 1991).

[75] *In re Kantos*, 579 B.R. at 851.

[76] *In re Miera*, 926 F.2d at 744.

[77] *Blocker v. Patch* (*In re Patch*), 356 B.R. 450, 459 (B.A.P. 8th Cir. 2006), *rev'd on other grounds*, 526 F.3d 1176 (8th Cir. 2008); *Iberia v. Jeffries* (*In re Jeffries*), 378 B.R. 238, 255–56 (Bankr. W.D. Mo. 2007); *Dennis v. Novotny* (*In re Novotny*), 226 B.R. 211, 217–19 (Bankr. N.D. 1998) (explaining that post-*Geiger*, the element of malice requires a lack of just cause or excuse); 4 Collier on Bankruptcy ¶ 523.13[2], p. 523–93.2 (16th ed. 2016).  Other circuits have found that a showing of malice under Section 523(a)(6) requires a lack of just cause or excuse.  *Accord Trost v. Trost* (*In re Trost*), 735 Fed. App'x 875, 878 (6th Cir. 2018); *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013); *Old Republic Nat'l Title Ins. Co. v. Levasseur* (*In re Levasseur*), 737 F.3d 814, 818 (1st Cir. 2013); *Maxfield v. Jennings* (*In re Jennings*), 670 F.3d 1329, 1334 (11th Cir. 2012); *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006); *Carrillo v. Su* (*In re Su*), 290 F.3d 1140, 1146–47 (9th Cir. 2002).

[78] As will be discussed later, at summary judgment Plaintiff failed to show as a matter of law that the findings from the underlying criminal and civil cases established the elements of a willful and malicious injury within the meaning of the Bankruptcy Code.

original, predicate decision that were made to support the outcome."[79]  The plaintiff must then

link the specific findings "to the elements of its claim in the current proceeding, in logical

satisfaction of those elements."[80]  While collateral estoppel can apply to dischargeability

proceedings, it is within the jurisdiction of the Court to determine whether Defendant's resulting

debt is nondischargeable under the Bankruptcy Code.

Under Minnesota law, a party asserting collateral estoppel must prove that: 1) the issues

are identical to those in a prior adjudication; 2) there is a final judgment on the merits; 3) the

estopped party was a party, or in privity with a party, in the previous action; and 4) the estopped

party was given a full and fair opportunity to be heard on the adjudicated issues.[81]

Here, in the criminal case, the State of Minnesota and Defendant agreed to submit the

matter to a bench trial on stipulated evidence.[82]  The doctrine of collateral estoppel is not

generally applied when the issues to be precluded were determined by a stipulation or consent

judgment.[83]  This is because facts established in prior litigation by stipulation, and not judicial

resolution, have not been "actually litigated."[84]

Stipulations can have preclusive effect in subsequent litigation, but only if the parties

have manifested such an intent.[85]  Here, there is no argument or indication that the parties had

such an intent.  In the criminal case, Defendant did not have a full and fair opportunity to be

heard on issues relevant to this adversary proceeding, namely the issue of self-defense and

---

[79] *New York v. Khouri* (*In re Khouri*), 397 B.R. 111, 117 (Bankr. D. Minn. 2008).

[80] *Id.*

[81] *Phillips v. Phillips* (*In re Phillips*), 500 B.R. 570, 576 (B.A.P. 8th Cir. 2013) (citing *Ellis v. Minneapolis Comm'n on Civil Rights*, 319 N.W.2d 702, 704 (Minn. 1982)).

[82] Ex. 10.  At summary judgment, Plaintiff failed to meet his burden as to the fourth element of collateral estoppel—whether the issues in this adversary proceeding were fully and fairly litigated in the criminal case.

[83] *CSX Transp., Inc. v. Clark*, No. 11–1593, 2012 WL 3031164, at *3 (D. Minn. July 25, 2012) (citing *Gall v. S. Branch Nat'l Bank of South Dakota*, 783 F.2d 125, 127 (8th Cir. 1986)).

[84] *Id.* (citing *United States v. Young*, 804 F.2d 116, 118 (8th Cir. 1986)).

[85] *Id.*

whether he acted with just cause or excuse.[86]  The issue of self-defense was not actually litigated in the criminal case and, thus, the doctrine of collateral estoppel is inapplicable.

Plaintiff also argues that collateral estoppel applies due to the findings in  the civil action because the jury awarded punitive damages, thus demonstrating malice.[87]  The jury awarded punitive damages after finding by clear and convincing evidence that Defendant acted with deliberate disregard for the rights of Plaintiff.[88]  Plaintiff, however, fails to explain how the finding of deliberate disregard for the rights of others satisfies the elements of his Section 523(a)(6) claim and the evidence provided to the Court from the civil action does not establish a basis for applying collateral estoppel.[89]

The jury instructions defined "deliberate disregard" as: 1) knowing about facts or intentionally ignoring facts that created a high probability of injury to the rights or safety of others; and 2) deliberately acting either with conscious or intentional disregard *or with indifference* to the high probability of injury to the rights or safety of others.[90]  The special verdict form does not indicate what the jury found in determining that Defendant acted with deliberate disregard or what factors were considered.  The jury may have found that Defendant acted with indifference to the high probability of injury, which amounts to a recklessness standard and does not conclusively demonstrate that Defendant acted maliciously.

The Court is unable to determine from the jury instructions, special verdict forms, and the civil court's findings whether Defendant's actions were malicious within the meaning of the Bankruptcy Code such that collateral estoppel would apply.  Plaintiff does not link any

---

[86] Judge Garcia's order in the criminal case provides that no findings were made with regard to self-defense.  Ex. 10.
[87] Pl.'s Post-Trial Br. 21–23, Dkt. 49.
[88] Ex. 4, at 5.
[89] The evidence before the Court from the civil action is sparse.  Plaintiff did not provide the complaint or the record from the civil trial.
[90] Jury Instructions – Punitive Damages, Ex. 8 (emphasis added).

underlying facts from the civil action to the elements of a Section 523(a)(6) claim. It is unclear

how Judge Sullivan arrived at her conclusion that Defendant committed an intentional battery.[91]

The determination may have been based on Defendant's criminal conviction, which was decided

on stipulated evidence. Plaintiff has not explained what facts were considered and relied on by

Judge Sullivan or the jury.

Plaintiff has failed to show that collateral estoppel applies to give the criminal conviction,

civil judgment, and the findings in both cases preclusive effect in this adversary proceeding.

Thus, the Court must analyze the facts established at trial to determine whether Defendant's

actions constitute a willful and malicious injury within the meaning of Section 523(a)(6).

## C.    Defendant's Actions were Willful

Plaintiff argues that Defendant caused a deliberate or intentional injury by stabbing

him.[92] At a minimum, Plaintiff asserts that Defendant was substantially certain that his actions

would result in a stab wound.[93] In support, Plaintiff relies on his own testimony that Defendant

came out of nowhere and intentionally stabbed him, Bolon's deposition testimony about

witnessing Defendant stab Plaintiff, and Defendant's admissions at trial.[94] Defendant's position

is that he intended to defend himself and Heather from Plaintiff's attack, rather than deliberately

cause Plaintiff harm.[95] Bankruptcy courts analyzing self-defense in the context of Section

523(a)(6) have found that a claim of self-defense amounts to an admission by the debtor that the

injury was willfully caused.[96]

---

[91] It is possible to be liable for assault or battery without rising to the level of intent necessary for a willful and malicious injury under the Bankruptcy Code. *See, e.g.*, *Hearing Assocs., Inc.*, 579 B.R. at 524–25 (collecting cases); 4 Collier on Bankruptcy ¶ 523.13[4], p. 523–96 (16th ed. 2016) ("Of course, when liability for assault may be imposed without proof of any element of malice, the liability will not necessarily be excepted from discharge.").
[92] Pl.'s Post-Trial Br. 2–3, 6–12.
[93] Pl.'s Post-Trial Br. 2–3, 6–12.
[94] Pl.'s Post-Trial Br. 2–3, 6–12.
[95] Def.'s Post-Trial Br. 10–11, Dkt. 51; Trial Tr. 90:7–17.
[96] *Vyshedsky v. Soliman* (*In re Soliman*), 539 B.R. 692, 699 (Bankr. S.D.N.Y. 2015) (finding that the debtor's claim of self-defense in biting plaintiff's nose amounts to an admission of willfulness); *Hernandez v. Greene* (*In re*

Here, there is no doubt that Defendant acted willfully when he stabbed Plaintiff. Defendant admits he grabbed a knife from the server well for protection, stuck the knife out, and stabbed Plaintiff. Defendant never claimed that he was trying to scare or intimidate Plaintiff nor that he stabbed Plaintiff by accident. The Court finds that Defendant acted willfully in stabbing Plaintiff.

**D.    Malice**

1.    Self-Defense and Malice

The Court must now determine whether Defendant acted with malice and without just cause or excuse. Although Defendant admits that his actions were reckless, Plaintiff must show a level of culpability beyond recklessness.[97] There is no dispute that Defendant's conduct was targeted at Plaintiff and that stabbing Plaintiff would result in certain or near certain harm. Instead, Defendant argues that he acted self-defense or in defense of Heather.[98] Absent a valid claim of self-defense, there is no just cause or excuse for Defendant's actions.

Although courts in the Eighth Circuit have rarely discussed the interplay between a claim of self-defense and the element of malice,[99] other courts have held that acts properly taken in

---

*Greene*), 397 B.R. 688, 695 (Bankr. S.D.N.Y. 2008) (finding that the debtor's claim of self-defense in stabbing plaintiff amounts to an admission of willfulness); *Kleman v. Taylor* (*In re Taylor*), 322 B.R. 306, 309 (Bankr. N.D. Ohio 2007); *see Deng v. Henton* (*In re Henton*), Adversary No. 13–1040–TPA, 2014 WL 585307, at *3 (Bankr. W.D. Pa. Feb. 13, 2014) ("By claiming self-defense, [debtor] necessarily admits to having intentionally stabbed [plaintiff] in order to protect himself.").

[97] Trial Tr. 230:20–23. At trial, Plaintiff testified that Defendant's actions were "absolutely reckless." Trial Tr. 199:1–3. Defendant makes much of this point, but ignores the fact that Plaintiff testified several times throughout trial that he believed Defendant's actions were intentional. *E.g.*, Trial Tr. 224:2–6, 23–24.

[98] At summary judgment, Plaintiff argued that by answering "no" when asked if Defendant reasonably believed that the use of force involving the risk of serious injury or death was necessary to protect himself or Heather, the jury foreclosed Defendant's argument of self-defense in this adversary proceeding. *See* Ex. 4. The Court rejected Plaintiff's argument, as he failed to explain how the jury's finding satisfied the elements of his nondischargeability claim. All it demonstrated was that Defendant used more force than reasonably necessary. The special verdict form did not, on its face, show a level of culpability beyond recklessness, which is required to prove malice.

[99] The few cases mentioning self-defense in relation to a nondischargeability claim do not undergo a substantial analysis of the issue. *See Schmidt v. Nelson* (*In re Nelson*), Adv. No. 16-5005, 2016 WL 5746252, at *2 (Bankr. S.D. Oct. 3, 2016) (citing a jury instruction regarding self-defense, but applying collateral estoppel in lieu of analyzing self-defense and its relation to the element of malice); *Oswald v. Gonsor* (*In re Gonsor*), 95 B.R. 123, 126 (Bankr. S.D. 1988) (noting that the state court rejected the debtor's claim of self-defense, but not analyzing the issue

14

self-defense can constitute a justifiable excuse and negate malice.[100]  While the issue of

nondischargeability is a matter of federal law governed by the Bankruptcy Code,[101] bankruptcy

courts have looked to state law for guidance because there are few federal cases addressing the

issue of self-defense in a nondischargeability claim under Section 523(a)(6).[102]

Under Minnesota law, a person may act in self-defense "if he or she reasonably believes

that force is necessary and uses only the level of force reasonably necessary to prevent the bodily

harm feared."[103]  A valid claim of self-defense requires: 1) the absence of aggression or

provocation on the part of the defendant; 2) the defendant's actual and honest belief that he or

she or another was in imminent danger of death or great bodily harm; 3) the existence of

reasonable grounds for that belief; and 4) the absence of a reasonable possibility of retreat to

avoid the danger.[104]  If a person is "outside his or her home and can safely retreat, then the

person's use of force is unreasonable as a matter of law."[105]  The issue for the Court to determine

is whether Defendant's actions at the time of the stabbing were justified or excused by a valid

claim of self-defense.

---

under the Bankruptcy Code); *Barnett v. Brown* (*In re Brown*), ADV. 88–7059, 1988 WL 1014965, at *2 (Bankr. N.D. Sept. 12, 1988) (finding that the debtor's claim of self-defense was not supported by the evidence and citing the possibility of retreat); *Strand v. Peterson* (*In re Peterson*), Adversary No. 87–0013, 1987 WL 1416803, at *2 (Bankr. S.D. Iowa Sept. 28, 1987) (applying collateral estoppel to find that the debtor's actions were done without just cause or excuse).

[100] *E.g.*, *In re Mathews*, 433 B.R. at 735 ("Self-defense can constitute a justifiable excuse for a defendant's actions and negate a claim of malice."); *In re Taylor*, 322 B.R. at 309 ("Acts properly taken, therefore, in self-defense provide a valid defense to an action brought under § 523(a)(6); this has always been understood.").

[101] *Garner*, 489 U.S. at 283–84.

[102] *E.g.*, *Clayton v. Simon* (*In re Simon*), Adversary No. 16–5009, 2017 WL 4118284, at *4 (Bankr. W.D. La. Aug. 3, 2017) (noting that because the Bankruptcy Code does not define "justification or excuse," bankruptcy courts tend to look to state-law defenses in cases involving intentional torts); *In re Mathews*, 433 B.R. at 735; *In re Taylor*, 322 B.R. at 309–10. Because self-defense is an affirmative defense, bankruptcy courts have placed the burden of proof on the debtor to show a valid claim of self-defense by a preponderance of the evidence. *In re Taylor*, 322 B.R. at 309; *see also Radermacher v. Sullivan*, 122 B.R. 720, 723–24 (Bankr. D. Minn. 1991) (recognizing self-defense as an affirmative defense in a dischargeability proceeding).

[103] *State v. Devens*, 852 N.W.2d 255, 258 (Minn. 2014).

[104] *Id.*; *see* Minn. Stat. § 609.06, subd. 1(3).  The jury was provided with substantially similar instructions on self-defense and defense of others.  Jury Instructions, Ex. 7, at 6.  In the civil case, the burden of proof for self-defense was the greater weight of the evidence.  Ex. 7, at 5.  The jury found that Defendant did not reasonably believe that the use of force involving the risk of serious injury or death was necessary to protect himself or Heather.  Ex. 4. at 3.

[105] *Devens*, 852 N.W.2d at 258.

2.    <u>Conflicting Testimony Regarding the Stabbing</u>

The parties provide conflicting testimony about the events leading up to the stabbing. Only three individuals witnessed it—Defendant, Plaintiff, and Bolon.

Defendant claims that he acted in self-defense and in defense of Heather.  Defendant testified that after being escorted to the restroom hallway, he intended to leave and go home.[106] After Heather left the restroom, the Riehms testified that they turned the corner of the restroom hallway to find that the Living Room had erupted into a brawl.[107]  Heather began walking further into the Living Room bar area to find her coat, which she remembered dropping after being punched by Plaintiff.[108]  The Riehms testified that Plaintiff then appeared from around the corner of a pillar, went directly at Heather, grabbed her by the neck, picked her up, choked her, and slammed her to the ground.[109]  Heather testified that she was choking and feared for her life.[110] Sudduth witnessed Plaintiff choke Heather.[111]  Defendant testified that Plaintiff broke away from security and charged at him with his arms raised.[112]  Believing he was about to be attacked, Defendant testified that he reached out and stabbed Plaintiff.[113]

Defendant characterizes the choking and stabbing incidents as one continuous chain of events.  He asserts that the chaotic nature of the Living Room caused him to become fearful, that Plaintiff punched Heather earlier in the night and choked her immediately before charging him, and that he was afraid of Plaintiff because of his size.  Given the chaos around him and his previous interactions with Plaintiff, Defendant argues he had an intense fear of imminent harm.

---

[106] Trial Tr. 98:3–15.
[107] Trial Tr. 98:3–15, 155:15–156:11.
[108] Trial Tr. 102:5–106:20, 155:15–156:11.
[109] Trial Tr. 102:6–106:20, 156:12–158:5.
[110] Trial Tr. 157:22–158:5.
[111] Trial Tr. 246:5–247:9, 251:15–18.
[112] Trial Tr. 106:21–107:1, 107:21–108:8.
[113] Trial Tr. 106:21–107:1, 107:21–108:8.

16

Plaintiff testified that he did not attack Heather.[114]  Further, Plaintiff testified that after

returning to the Living Room to find his friend, he was heading back to the W Hotel's elevators

when Defendant appeared without warning and stabbed him.[115]  Plaintiff raised his arms to

defend himself, but was unarmed.[116]  Plaintiff denies ever charging at Defendant.[117]

   3.    Defendant's Actions were Malicious

   If the Riehms' story was true, Defendant may have a valid claim of self-defense.  To

account for the contrasting stories, Defendant emphasizes that while he was sober, Plaintiff was

heavily intoxicated.[118]  Due to Plaintiff's level of intoxication and self-interestedness, the Court

gives little weight to Plaintiff's testimony.  The Court, however, does not believe the Riehms'

version of the facts.  Their testimony is not reliable or credible due to intoxication or self-

interestedness.[119]

   First, whether Plaintiff punched Heather is not determinative of whether Defendant acted

in self-defense at the time of the stabbing.  This altercation occurred at or near last call, which

was approximately a half-hour before the stabbing incident.  The reasonableness of Defendant's

actions must be determined at the time of the stabbing, not earlier in the evening.[120]  Further,

multiple disinterested witnesses testified that Defendant was yelling, shoving, and was an

aggressor earlier in the night.[121]

   Second, Sudduth's testimony makes it clear that the choking and stabbing incidents were

not a continuous chain of events.  Last call at the Living Room took place at 1:35 A.M., with bar

---

[114] Trial Tr. 185:23–186:8.
[115] Trial Tr. 189:14–190:22.
[116] Trial Tr. 193:1–12, 195:2–12, 210:25–211:5.
[117] Trial Tr. 191:6–7.
[118] Def.'s Post-Trial Br. 3–4.  At 5:22 A.M. on January 1, 2014, Plaintiff's blood alcohol content was .147.  Ex. S.
[119] Disbelief of a debtor's testimony in a nondischargeability action can be used to support a finding that the debtor acted maliciously.  *Johnson v. Fors* (*In re Fors*), 259 B.R. 121, 140 (B.A.P. 8th Cir. 2001).
[120] *See supra* note 66.
[121] Ex. B, at 79:2–9; Ex. AE, at 61:10–62:7.

17

close five minutes later at 1:40 A.M.  At bar close, the Living Room turned on the lights, shut off the music, and stopped serving alcohol.  The choking altercation took place when the music was very loud and the lights were off.[122]  But the lights were on and the music was off before the stabbing and prior to the time the Riehms were in the server well area.[123]  The stabbing occurred at approximately 2:00 A.M.  Thus, there was at least ten or more minutes between the choking incident and the stabbing.

Although Plaintiff's act of choking Heather is reprehensible, Defendant's claim of self-defense depends on the timing of the choking and the stabbing.  While the exact time of the choking incident is not known, it is clear that at least ten minutes elapsed before the stabbing occurred.  Defendant's story that they were simultaneous or that there was an altercation immediately prior to the stabbing is not supported by the evidence.

Third, Defendant argues that he grabbed the knife in part due to the chaos taking place in the Living Room.  His story is contradicted by several independent witnesses.  Bolon testified that she was alone in the sever well area with the Riehms and that most of the patrons had left the Living Room.[124]  According to Sudduth, the night was ending and there were not many people left in the Living Room.[125]  Although there was another fight taking place at the time, it was in the arcade area of the W Hotel, away from the Living Room.  Bolon, Sudduth, Tomczyk, and Smith all said that the fight in the arcade took place at approximately the same time as the stabbing, but was unrelated.[126]

Fourth, even if Defendant's story that the attack on Heather and stabbing occurred simultaneously is true, Sudduth and Defendant both testified that multiple security officers

---

[122] Trial Tr. 151:21–252:10; Ex. A, at 27:23–28:1.
[123] Ex. A, at 25:20–26:3, 27:11.
[124] Ex. C, at 62:6–19; *see supra* notes 35–36.
[125] Ex. A, at 25:20–26:3, 59:19–60:15.
[126] *See supra* note 46.

rushed over and pulled Plaintiff from Heather.[127]  If true, the presence of security, coupled with

the fact that Plaintiff was unarmed, casts doubt on whether Defendant harbored an actual and

honest belief he was in imminent danger of bodily harm and needed to repel Plaintiff's "charge"

by stabbing him.[128]  The facts and circumstances do not demonstrate a reasonable basis for any

such belief.[129]

Fifth, the Court finds that Defendant had a reasonable possibility of retreat to avoid any

danger or threat from Plaintiff.  Defendant had at least ten minutes to avoid the confrontation

altogether.  Further, the Riehms had been to the Living Room several times before the New

Year's Eve party.[130]  At her deposition, Sudduth listed at least three other exits in addition to the

front entrance.[131]  The arcade fight may have prohibited a few of these alternative options, but

the Riehms did not attempt to exit through the door leading to Manny's.[132]  This door is located

on the opposite side of the Living Room, away from the front entrance and arcade.  It is the same

door the Riehms used to enter the Living Room.  The Riehms did not wait in the restroom

hallway or seek refuge in the nearby kitchen area, which was unlocked and used by Sudduth and

her staff to hide after the stabbing.[133]  The Riehms did not go upstairs to the second floor, also in

---

[127] Trial Tr. 106:1–20, 247:6–9, 253:4–20.

[128] For instance, the *Greene* court found that the debtor did not face an imminent threat of death or serious harm
when the plaintiff was unarmed and only threw one punch.  397 B.R. at 695.

[129] Similarly, the *Taylor* court found that it was not feasible that the debtor could have realistically believed he was
in imminent danger of physical harm.  322 B.R. at 310.  There, the debtor initiated the conflict before being pushed
by the plaintiff, there was no evidence the plaintiff continued to pursue or threaten the debtor, and there was no
evidence the debtor could not have safely retreated.  *Id.*  As with the debtor in *Taylor*, Defendant cannot be
considered guiltless and, more importantly, could have safely retreated or avoided the confrontation altogether.
Defendant's circumstances are distinguishable from the danger faced by the debtor in the *Mathews* case.  There, the
plaintiff taunted, harassed, and challenged the debtor to a fight, and a ring of drunken individuals formed around the
parties encouraging them to fight.  433 B.R. at 736–39.  Debtor only threw one punch in response to being shoved
by the plaintiff and started to back away before the plaintiff's friends chased the debtor down and punched him.  *Id.*
at 737.  The *Mathews* court found that the debtor reasonably feared for his safety from the unruly crowd.  *Id.*  The
fact that the debtor only struck one blow evidenced the reasonableness of his response.  *Id.*

[130] Trial Tr. 100:23–101:1; Ex. AB, at 18:8–13.

[131] Ex. A, at 56:24–57:17.

[132] Trial Tr. 100:12–15.

[133] Trial Tr. 99:20–23, 100:3–6, 256:3–18, 257:4–13.

the opposite direction of the front entrance, to look for another exit.[134]  Defendant did not warn

Plaintiff he had a knife, show Plaintiff the knife, back up from Plaintiff, or try to run away.[135]

Most significant is the fact that Defendant's story is directly contradicted by Bolon's

testimony.  She is disinterested and is the only non-party to have witnessed the stabbing.  Bolon

saw the Riehms talking near the sever well where she was stationed.  The Riehms were visibly

upset and agitated.  Bolon witnessed Defendant look around the area and heard him say

something to the effect of "Nobody treats my wife like that."  Defendant then walked into the

server well, grabbed a steak knife, and put it up his coat sleeve to hide it.  Bolon approached

Defendant and instructed him to return the knife.  Defendant again repeated something to the

effect of "Nobody treats my wife like that" and left the area.  Bolon then started yelling "He's

got a knife."[136]

Bolon's eyes never left Defendant once he grabbed the knife.[137]  She witnessed

Defendant walk briskly as if he was moving directly to someone or something.[138]  Bolon then

saw Defendant approach Plaintiff, stab him, and throw the knife down.[139]  Bolon did not believe

Plaintiff saw Defendant coming and did not think Plaintiff had a chance to defend himself.[140]

---

[134] Trial Tr. 100:7–11.

[135] Trial Tr. 107:2–23.  *Compare In re Soliman*, 539 B.R. at 701 (rejecting the debtor's claim of self-defense, finding instead that the debtor was responsible for putting himself in the situation and could have avoided any confrontation by retreating), *In re Greene*, 397 B.R. at 695 (finding that the debtor could have avoided any confrontation by retreating and citing several alternatives available to the debtor rather than stabbing plaintiff), *and In re Taylor*, 322 B.R. at 310–11 (rejecting a claim of self-defense in part due to the debtor's failure to retreat), *with In re Henton*, 2014 WL 585307, at *8–9 (accepting the debtor's claim of self-defense, finding that the debtor was not the initial aggressor, that he attempted to retreat, he was on the ground being kicked and punched before pulling out the knife, and announced the fact that he had a knife before using it to defend himself), *and In re Mathews*, 433 B.R. at 736–39 (finding that the debtor acted in self-defense when he was not the initial aggressor, was surrounded by a crowd of people encouraging a fight, was pushed first by the plaintiff, only struck one blow in response to being pushed, and attempted to retreat before being chased down and punched by plaintiff's friends).

[136] Trial Tr. 255:15–22; Ex. C, at 87:16–88:10.

[137] Ex. C, at 105:14.

[138] Ex. C, at 79:25–80:7.

[139] Ex. C, at 80:22–81:11, 82:13–15.

[140] Ex. C, at 82:2–12.

According to Bolon, and contrary to Defendant's story, there were no security officers present.[141] At the time, the entire security team was responding to the arcade fight.[142]

Bolon's testimony shows that Defendant's actions were beyond reckless. Defendant acted maliciously and without just cause or excuse. Defendant's conduct was targeted at Plaintiff and stabbing him was certain or almost certain to cause harm.[143] Defendant could not have reasonably believed that he was in imminent danger of bodily harm. The facts show that he could have safely retreated or otherwise avoided stabbing Plaintiff.

The overwhelming weight of the evidence presented in this adversary proceeding shows that Defendant stabbed Plaintiff in retaliation rather than in self-defense. There is no just cause or excuse for his conduct. In stabbing Plaintiff, Defendant acted both willfully and maliciously within the meaning of Section 523(a)(6). The civil judgment debt owed to Plaintiff is therefore nondischargeable.

## E.     **Damages**

The parties do not contest the dischargeability of Defendant's restitution obligation. It is nondischargeable.[144]  Instead, Defendant seeks a reduction of the civil judgment based on equity. Defendant argues the civil judgment should be reduced by the following amounts: 1) the amount of restitution to avoid double recovery; 2) Plaintiff's negotiated discount on his medical bills with Mayo Clinic; 3) Medica's subrogation claim; and 4) punitive damages. The Court declines to do so and finds the civil judgment debt nondischargeable in its entirety.

---

[141] Ex. C, at 89:19–21.

[142] *See supra* note 29.

[143] *See supra* notes 128–29 and accompanying text.

[144] Pursuant to Supreme Court precedent, Section 523(a)(7) preserves from discharge all state-imposed criminal restitution obligations. *Colton v. Verola* (*In re Verola*), 446 F.3d 1206, 1208–10 (11th Cir. 2006) (citing *Kelley v. Robinson*, 479 U.S. 36 (1986)). Minnesota's restitution statute provides that an order for restitution is a debt that is nondischargeable in bankruptcy. Minn. Stat. § 611A.04, subd. 3.

Under the *Rooker-Feldman* doctrine, lower federal courts lack subject matter jurisdiction to hear challenges to determinations made by state courts.[145] The doctrine is applied by federal courts to prevent state-court losers from complaining of injuries caused by state-court judgments in federal court.[146] Judge Garcia addressed Defendant's concerns about potential double recovery in the criminal case and, consistent with Minnesota's restitution statute, she ordered that any restitution payments would be credited toward the civil judgment.[147] Also, in the civil case, Defendant litigated the effect and amount of Medica's subrogation claim. Judge Sullivan reduced the amount of the subrogation claim from $57,123.24 to $51,656.27.[148] Under *Rooker-Feldman*, the Court lacks jurisdiction to alter these amounts.

Subsequent to Judge Sullivan's Order Determining Collateral Sources, Plaintiff was able to reduce his outstanding medical expenses at Mayo Clinic from $32,661.65 to $10,000.00.[149] Defendant argues that the civil judgment should be reduced by the savings of $22,661.65 in order to prevent a windfall. Under Minnesota law, only collateral sources available at the time of the verdict are deducted.[150] Plaintiff negotiated and obtained the discount with Mayo Clinic close to two years after the jury's verdict. No reduction will be made on this basis.

Finally, Defendant urges the Court to reduce the civil judgment by the amount of punitive damages. He argues that because punitive damages are used as a form of punishment and are not compensatory, an award of punitive damages cannot be found nondischargeable under Section 523(a)(6). Defendant cites to the bankruptcy court's decision in *Schmidt v. Schmidt* for

---

[145] *In re Mus*, 598 B.R. 623, 628 (Bankr. D. Minn. 2019). The doctrine originates with the cases of *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).
[146] *In re Mus*, 598 B.R. at 628.
[147] Ex. 11.
[148] Order Determining Collateral Sources, Ex. 5, at 4–5, Aug. 4, 2016.
[149] Ex. 41.
[150] Minn. Stat. § 548.251, subd. 1.

support.[151]  The Eighth Circuit has overruled *Schmidt* and has held that an award of punitive

damages stemming from the same willful and malicious injury as an award of compensatory

damages is nondischargeable.[152]  Therefore, the civil judgment will not be reduced by the jury's

award of punitive damages.

## CONCLUSION

Defendant's act of stabbing Plaintiff was willful and malicious, as required for a

determination of nondischargeability under Section 523(a)(6).  The Court finds that Defendant's

civil judgment debt owed to Plaintiff is nondischargeable in its entirety.

## CONCLUSIONS OF LAW

1.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I)

and this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) & 1334.

2.      Venue is proper before this Court under 28 U.S.C. §§ 1408 & 1409.

3.      Defendant's civil judgment debt is nondischargeable under 11 U.S.C. § 523(a)(6)

## ORDER

IT IS ORDERED:      The Defendant's debt to the Plaintiff is excepted from discharge.

LET JUDGMENT BE ENTERED ACCORDINGLY.

/e/ Kathleen H. Sanberg
_____
Kathleen H. Sanberg
United States Bankruptcy Judge

---

[151] *In re Schmidt*, 36 B.R. 834 (Bankr. D. Minn. 1984).
[152] *In re Miera*, 926 F.2d at 745; *see Fischer v. Scarborough* (*In re Scarborough*), 171 F.3d 638, 644–45 (8th Cir. 1999) (noting the consistency of the Eighth Circuit's position with its sister Circuits).